**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | | |
|---|---|---|
| FRAN DONOVAN et al.,<br>Plaintiffs,<br>vs.<br>FLAMINGO PALMS VILLAS, LLC et al.,<br>Defendants. | ) | 2:08-cv-01675-RCJ-RJJ<br><br>**ORDER** |

The present case arises out of an alleged conspiracy to defraud investors in a condominium development in Las Vegas. Plaintiffs are those who purchased units in the Development. Defendants are those who developed, promoted, sold, appraised, and financed the Development. Several Defendants have separately moved to dismiss for improper service, and one of these Defendants has also moved to quash an attempted service.

## I. FACTS

Plaintiffs are eighty-seven individuals who, from 2005 to 2007, purchased condominium units in a development called the Palm Villas, Las Vegas Cay Club Condominiums (the "Development"). Originally, there were 139 Defendants, 121 of whom remained in the Second Amended Complaint ("SAC") (ECF No. 183). Defendants are individuals and entities who allegedly defrauded Plaintiffs, or assisted in defrauding Plaintiffs, into purchasing units in the Development. The Development consists of an approximately twelve-acre plot of land on which

sit sixteen three-story apartment buildings, containing a total of 360 rental units. The three apartment buildings occupy 2.64 acres. The remaining 9.44 acres consist of several hundred parking spaces, swimming pools, and other open land (the "Common Area").

Beginning in 2004, Defendants began promoting and selling the 360 units in the Development to buyers. Defendants promoted the Development as a "resort community" that would be developed into a hotel. Initially, and before assuming its current name, the Development was called the Las Vegas Cay Club Resort & Marina. Defendants allegedly represented that the Development already boasted numerous valuable amenities, such as large covered patios, weight rooms, and spas, and that Defendants planned to enhance the Development with many other amenities, such as a game room, a water park, a restaurant, and conference facilities. By paying a non-refundable $5000 payment, Plaintiffs were allowed to enter into a Reservation Agreement, which required a $10,000 non-refundable payment per unit reserved for purchase. Plaintiffs were later provided with a price list for the units, ranging from $199,000 to $499,900. After Plaintiffs invested, Defendants circulated various brochures and letters to Plaintiffs, informing Plaintiffs of the status of the Development. These letters and brochures described or displayed images of the various improvements that were being done to the Development. Defendants also circulated a map of the Development.

Plaintiffs allege that the deeds they received in the purchase of each unit represented that Plaintiffs had an interest not only in their purchased units, but also in the Common Area, which included parking spaces, swimming pools, and many other valuable amenities that Defendants promised to add to the Development. After the deeds were signed, Plaintiffs allege that Defendants circulated a fifty-seven-page declaration stating that Plaintiffs' interests in the Development did not in fact include the Common Area, but were limited to their individually purchased rental units and the areas common to their particular buildings. As a result, Plaintiffs' purchased units did not even include any of the Development's parking spaces. Plaintiffs

contend that the representations made in the declaration conflicted with the advertising and other promotional representations made by Defendants, the deeds, and the appraisals on the units upon which Plaintiffs relied in deciding to invest in the Development.

Plaintiffs are suing several groups of Defendants. First, Plaintiffs are suing those individuals who were directly behind purchasing the Development and concocting the alleged scheme, as well as the companies they formed to carry out the scheme. These Defendants include David Schwarz, F. Dave Clark, W. Scott Callahan, David Band, Stanley Kane, Craig Holt, Jeffrey Aeder, Kevin Connor, Harvey Birdman, Herbert Hirsch, Michael Werner, Marc Roberts, Harris Friedman, Donneil Hecer, and Louis Birdman. Entity Defendants in this group include nineteen entities formed, owned, and operated by Schwarz and Clark; two entities formed, owned, and operated by Schwarz, Callahan, and Clark; one entity formed, owned, and operated by Clark alone; three of Band's companies; one entity formed by Holt and Schwarz; one entity formed by Aeder and Connor; and twelve entities formed, owned, and operated by Harvey Birdman, Hirsch, Werner, Roberts, Friedman, Hecer, and/or Louis Birdman. Plaintiffs allege that these individuals owned, operated, or managed many entities in an effort to carry out the alleged scheme, which entities are also named as Defendants. Collectively, Plaintiffs call these Defendants the "LVCC Defendants."

Second, Plaintiffs are suing individuals who formed, owned, and/or operated a company called International Association of Investors, LLC ("IAI"). These individuals include Don Burnham, Justin Burnham, Marc Burnham, George Homick, and Cindy Richichi. IAI was allegedly significantly involved with recruiting investors. Plaintiffs are also suing IAI itself, and they refer to these Defendants collectively as the "IAI Defendants."

Third, Plaintiffs are suing two individuals, Dianne Sealey and Faye Rivera, who served as appraisers of the Development's rental units. Plaintiffs are also suing The Appraisal Team, LLC, the company owned or operated by Sealey and Rivera. Plaintiffs refer to these Defendants

collectively as the "Appraiser Defendants." Plaintiffs allege that the Appraiser Defendants were agents of the LVCC Defendants and worked with them to carry out the scheme by overvaluing the rental units by as much as 80%.

Fourth, Plaintiffs are suing individuals or companies that acted as sales agents for the Development's rental units or who acted as loan brokers in connection with the financing obtained to purchase the rental units: Barry Graham, Phil Graham, Georgia Ann Johnson, Mortgage Loan Specialists, Inc. (formed by Johnson), Ross Pickard, John Sinclair, Ricky Stokes, Fred Clark, Colin Brechbill, Mike Olivera, Frank Dowd, Allison Tolson, Kelly Schnorenberg, Todd Bradford, Susan Russell, Adiel Gorel, Dan Beit, and Trudy Herrell. Plaintiffs refer to these Defendants collectively as the "Seller/Broker Defendants."

Fifth, Plaintiffs are suing thirty-nine entities that provided loans to Plaintiffs in connection with the purchase of the rental units. Plaintiffs refer to these Defendants as the "Financial Institution Defendants."

Sixth, Plaintiffs are suing Commonwealth Land Title Insurance Company ("CLTI"), one of the title companies involved in the transactions. Plaintiffs refer to this Defendant as the "Title Insurance Company Defendant."

Plaintiffs allege that the Defendants acted in concert in a "convoluted interrelationship each with the other" to carry out the alleged scheme, which resulted in the sale of 342 of the 360 rental units in the Development, producing approximately $120 million in sales. Plaintiffs allege that the IAI Defendants, the Seller/Broker Defendants, and the Appraiser Defendants acted directly or indirectly with the LVCC Defendants to carry out the scheme. Plaintiffs allege that the Seller/Broker Defendants acted as agents for the Financial Institution Defendants, and that the Financial Institution Defendants thereby are charged with the fraudulent acts of the Seller/Broker Defendants.

According to Plaintiffs, no improvements were ever made to the Development as was

represented, and Plaintiffs have enjoyed no interest in their purchased units. Plaintiffs allege that Defendants have managed and controlled the purchased units since their sale, utilizing them for hotel rentals and other means or stripping them of all their furniture and fixtures. The LVCC Defendants will not return possession of the purchased units to Plaintiffs and will not account for the rental income. In the end, Plaintiffs allege that they are left with "title to a downgraded physical unit only, without parking, have no interest in any of, what was identified in the subdivision map as, the 'common element,' owe homeowner association dues and levies for maintenance of 'common areas,' that the PLAINTIFFS investors did not and do not own, and are liable for millions in loans which funds were provided to the LVCC DEFENDANTS which funds were not used to create a resort property as represented." As a result, Plaintiffs have filed the present lawsuit seeking rescission of the sales, a cancellation of the related loans, a return of the monies paid, a clearance of the adverse credit reports that have resulted from defaults on the loans, an appointment of a receiver to take over the Development, and an injunction to prevent any further encumbrances against the Development.

## II. PROCEDURAL HISTORY

Plaintiffs filed the Complaint on November 26, 2008. (Compl., ECF No. 1). Several Defendants filed motions to dismiss. On March 16, 2009, Plaintiffs filed their First Amended Complaint ("FAC"). (First Am. Compl., ECF No. 126). The FAC differed significantly from the original Complaint in how it classified the various groups of Defendants and in how it directed certain allegations at specific Defendants. The FAC sought to remedy some of the arguments brought out by the various motions to dismiss.

In response to the FAC, Defendant David Band filed a renewed Motion to Dismiss. On June 23, 2009, the Court granted six motions to dismiss, with leave to amend. In that order, (*see* ECF No. 177), the Court noted that the FAC failed to present facts demonstrating wrongs by particular Defendants, as required under Rule 9(b) for actions sounding in fraud. Specifically as

to Band, the FAC failed to allege what section of the Securities Act of 1933 or the Securities and Exchange Act of 1934 Band allegedly violated, to identify each alleged fraudulent or misleading statement made by Band and why it was fraudulent or misleading, to allege facts giving rise to a strong inference of the scienter required for fraud, or to otherwise comply with Rule 9(b). Nor did the FAC identify what kind of "security" was allegedly at issue. The Court dismissed the claims against Band as to the Securities Act of 1933 and the Securities and Exchange Act of 1934, the fraud claims under the Interstate Land Sales Full Disclosure Act, the RICO claims, the common law fraud claims, and the civil conspiracy and constructive trust claims, all because of failure to plead with the requisite particularity under Rule 9(b). The Court also dismissed all claims against the Financial Institution Defendants for failure to plead agency with the required particularity under Rule 9(b). The Court noted that Plaintiffs would have to allege which Seller/Broker Defendants were agents of which Financial Institution Defendants in order to implicate any of the latter in fraud. Plaintiffs would also need to identify which specific actions were taken by which Seller/Broker Defendants to constitute fraud, including "time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." Plaintiff then filed the SAC (ECF No. 183).

The Court later granted Defendant Stump's motion to dismiss the SAC, but granted Plaintiffs leave to amend "with respect to [Stump] only." (Order 12:24–25, Mar. 15, 2010, ECF No. 326). Plaintiffs filed the Third Amended Complaint ("TAC") (ECF No. 335), which made more than the permitted amendments, adding a total of ten pages and changing the structure of the complaint in ways not permitted by the order. First, Plaintiffs have re-categorized Defendants into new groups: (1) the Fraudulent Enterprise Defendants ("FED"); (2) the Promoter/Broker Defendants; (3) the Appraiser Defendants; (4) the Financial Institution Defendants; and (5) the Title Company Defendants. The FED consist of seventeen Individual FED and thirty-eight Corporate FED, and appear to be the same or roughly the same as the

previous LVCC Defendants. The twenty-five Promoter/Broker Defendants appear to be the same or roughly the same as the previous Seller/Broker Defendants plus the previous IAI Defendants. The Title Company Defendant is now sued in "two capacities." Second, the facts section is almost completely rewritten. It is so different from the facts section of the SAC that a line-by-line comparison to identify particular differences is impracticable. The Court has denied various Defendants' motions to strike the TAC. Several Defendants have now separately moved to dismiss for improper service or lack of personal jurisdiction, and one of the movants has also moved to quash an attempted service.

## III. LEGAL STANDARDS

### A. Rules 4(m) and 12(b)(5)

> If a defendant is not served within 120 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period. This subdivision (m) does not apply to service in a foreign country under Rule 4(f) or 4(j)(1).

Fed. R. Civ. P. 4(m). A court may dismiss a complaint for insufficient service of process. Fed. R. Civ. P. 12(b)(5). A district court must extend time for good cause shown. *Lemoge v. United States*, 587 F.3d 1188, 1198 (9th Cir. 2009). The party desiring an extension of time bears the burden of proving good cause, and "[g]ood cause exists only when some outside factor[,] such as reliance on faulty advice, rather than inadvertence or negligence, prevented service." *Profit v. Americold Logistics, LLC*, 248 F.R.D. 293, 296 (N.D. Ga. 2008) (quoting *Lepone-Dempsey v. Carroll Cnty. Comm'rs*, 476 F.3d 1277, 1281 (11th Cir. 2007) (citing *Prisco v. Frank*, 929 F.2d 603, 604 (11th Cir. 1991))) (internal quotation marks omitted) (second alteration in original). However, excusable neglect may constitute good cause if a plaintiff can also show actual notice to the defendant, a lack of prejudice to the defendant, and severe prejudice to the plaintiff. *Lemoge*, 587 F.3d at 1198 n.3. Even if a party fails to show good cause, a district court may extend time for excusable neglect alone. *Id.* at 1198. A district court has discretion to extend

time retroactively. *Mann v. Am. Airlines*, 324 F.3d 1088, 1090 (9th Cir. 2003).

**B. Rule 12(b)(2)**

A court may dismiss an action for lack of personal jurisdiction over a defendant. Fed. R. Civ. P. 12(b)(5). The present movants do not argue a lack of general or specific jurisdiction under the due process clause, but only note that without proper service, there is no personal jurisdiction over them.

## IV. ANALYSIS

Plaintiffs filed the TAC on March 31, 2010. (*See* Third Am. Compl., Mar. 31, 2010, ECF No. 335). The time limit to serve Defendants with the TAC was therefore July 29, 2010.

First, the motion to dismiss purportedly filed by IAI is stricken. Corporate entities may only appear in federal court through counsel, and someone has filed a motion "Pro Se" on behalf of IAI. *See Rowland v. Cal. Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 202 (1993) (citing 28 U.S.C. § 1654); *United States v. High Country Broad. Co.*, 3 F.3d 1244, 1245 (9th Cir. 1993) ("A corporation may appear in federal court only through licensed counsel."). This motion does not constitute an appearance by IAI.

Second, Defendant David Schwartz's motion to dismiss is granted. Schwartz alleges he was not served with the TAC until September 9, 2010, which was the first version of the Complaint with which he was served, over 652 days after Plaintiffs filed the Complaint. Schwartz argues that the 652-day delay is far beyond the limits of excusable neglect and that Plaintiffs could not possibly show good faith in attempting to timely serve him. Schwartz also argues that he "may have been vaguely aware that the lawsuit had been filed against him," but he never avoided service. He also claims he will be prejudiced by an extension of time if the statute of limitations would otherwise have run. Schwartz attests that he has resided at the same Florida address for over twelve years and never saw a copy of the Complaint until service on September 9, 2010. (*See* Schwartz Aff. ¶¶ 2–3, Sept. 29, 2010, ECF No. 432-1). He also attests that

although he had "vague knowledge" of having had a lawsuit filed against him, he was not aware of the nature of the claims in the present suit before he was served in September 2010 and that he never attempted to evade service. (*See id.* ¶¶ 3–4). The Court grants Schwartz's motion to dismiss but will extend time to serve him. As with the other movants, the Court finds incredible that Schwartz was not actually aware of the nature of the present lawsuit against him.

Third, Defendants Don, Marc, and Justin Burnham's ("the Burnhams") separate motions to dismiss are granted. The Burnhams argue that the Complaint was filed on November 26, 2008, and that Don Burnham was not served until August 27, 2010, more than 120 days later. Although the operative version of the Complaint is the TAC, the time limit for serving the TAC was June 29, 2010. Marc and Justin Burnham argue that service upon them at Don Burnham's residence in Florida was improper, because, as Don Burnham attests, Marc and Justin did not reside there at the time of attempted service. (Don Burnham Aff. ¶¶ 4–6, Sept. 16, 2010, ECF No. 426, at 10). The Burnhams argue that Plaintiffs cannot show excusable neglect, because they made no attempts to timely serve them with the TAC (or the other versions of the Complaint).

In their consolidated response to the Burnhams' separate motions, Plaintiffs incorrectly argue that the Burnhams have the burden of proving they were not served. Once personal jurisdiction is challenged, Plaintiffs have the burden of proving service because they are invoking the Court's jurisdiction over the Defendants. *See, e.g., Butcher's Union Local No. 498 v. SDC Inv., Inc.*, 788 F.2d 535, 538 (9th Cir. 1986). In support of their motion, Plaintiffs provide affidavits of service on the Burnhams and IAI, all served on August 27, 2010 at 500 Cerromar Dr., Venice, FL 34293. (*See* Affs., Aug. 30, 2010, ECF No 436-1, at 1–4). Don Burnham was personally served, and the others were served by abode service by leaving the summons and TAC with Don Burnham. (*See id.*). Plaintiffs also adduce an LLC annual report, listing IAI's address as 500 Cerromar Dr., Venice, FL 34293, as well as a 2010 report listing

Justin Burnham's address as registered agent for IAI as 500 Cerromar Dr., Venice, FL 34293. It is doubtful the Burnhams resided at that location.[1] The Court denies Don Burnham's motion to dismiss, as he has been personally served. The Court grants Marc and Justin Burnham's motions to dismiss, but will extend time to serve them.

Fourth, W. Scott Callahan moves to dismiss and to quash service. The Court grants these motions. Callahan argues that Plaintiffs never attempted service upon him until December 2010, when Plaintiffs made three insufficient attempts to serve him: first, by abode service when no person of suitable age was present; second, at Callahan's place of business, but not leaving the papers with anyone; and third, again at Callahan's place of business, leaving the papers with a Mr. Mark Matteson, who was not Callahan's agent for service of process. (*See* Callahan Decl. ¶¶ 4–10, Jan. 3, 2011, ECF No. 483, at 8). These attempts were all indeed insufficient, and no attempt to serve Callahan with the TAC was made until four months after the four-month time limit had lapsed.

In response, Plaintiffs first note that the Court recently retroactively extended time to serve Callahan (and all remaining Defendants) until December 20, 2010. (*See* Order, Jan. 14, 2011, ECF No. 508). Plaintiffs also note that on December 14, 2010, the process server left a

---

[1]A check of the website www.zabasearch.com shows that a "Justin Burnham" has resided at three addresses in Venice, FL, none of which are on Cerromar Dr. He likely used this address as a mailing address only for business—he lists the address in his capacity as registered agent for IAI—but did not actually reside there. A "Marc Burnham" is listed as having a Dancing River Dr. residence in Venice, FL. Plaintiffs have not met their burden of showing Marc or Justin resided at the Cerromar Dr. address, and contrary to Plaintiffs' assertions, in Florida a person cannot be properly served by substitute service at a business address, but only at his residence, unless the business is a sole proprietorship, which IAI is not. *See* Fl. Stat. § 48.031(2)(b) (2010). Substitute service in Florida may also be effectuated by leaving the papers at a person's usual place of abode with a person fifteen years old or older residing therein who is informed of the contents, or by serving them on a defendant's spouse at any place in the county if the spouses are not adverse in the action, they reside together, and the defendant requests service in this manner. *See id.* § 48.031(1)(a), (2)(a). The federal rules permit service according to state law, by personal service, by abode service, or by agent service, but not by substitute service at a person's place of business. *See* Fed. R. Civ. P. 4(e).

copy of the Summons and Complaint at Callahan's place of business with Mr. Mark Matteson, who had claimed he could accept service of process for Callahan. (*See* Ortiz Decl. ¶ 12, Jan. 20, 2011, ECF No. 510). Plaintiffs, however, adduce no evidence that this was actually the case, and the doctrine of apparent authority, although perhaps effective to bind a principal in contract through the actions of an agent, is not sufficient to overcome the requirements of the Due Process Clause in the context of service of process. Also, there is no evidence Callahan ever willfully held Matteson out as his agent to Ortiz or Plaintiffs in the past, so even apparent authority has not been shown under the circumstances. In equity, however, the Court will extend time to serve Callahan, because Plaintiffs acted reasonably and were simply fooled by Matteson's innocent but ineffective attempt to accept service of process on behalf of Callahan. Also, this was approximately the tenth attempt by Ortiz to serve Callahan at his home or office. Callahan is apparently attempting to avoid service in bad faith. Ortiz attests that during her December 3, 2010 visit to his office, she heard the receptionist communicate with Callahan on the speaker phone, and Callahan, who was in the office, directed her not to accept the papers. (*See id.* ¶ 10(b)). Several attempts at abode service failed when the doorbell went unanswered or the maid denied the Callahans were home, despite their automobile being present in the driveway on at least one of these occasions. (*See id.* ¶ 10(c)–(i)). The Court grants Callahan's motions because substitute service is not permitted at a person's business under Florida or federal law, and Matteson was not Callahan's agent for service of process, but the Court will extend time to serve him.

**CONCLUSION**

IT IS HEREBY ORDERED that the Motion to Dismiss (ECF No. 428) is STRICKEN.

IT IS FURTHER ORDERED that the Motion to Quash (ECF No. 481) is GRANTED.

IT IS FURTHER ORDERED that the Motion to Dismiss (ECF No. 429) is DENIED.

IT IS FURTHER ORDERED that the Motions to Dismiss (ECF Nos. 426, 427, 432, 483)

are GRANTED.

IT IS FURTHER ORDERED that the Motion to Dismiss (ECF No. 541) and Motion to Extend Time (ECF No. 547) are DENIED as moot.

IT IS FURTHER ORDERED that Plaintiffs shall have ninety (90) days from the date of this order to serve any yet-unserved Defendants named in the TAC. This does not constitute leave to amend to add more defendants. As it appears several Defendants are willfully avoiding service, Plaintiffs may sèrve any Defendants by mail or via their attorneys.

IT IS SO ORDERED.

Dated this 17th day of March, 2011.

ROBERT C. JONES
United States District Judge