**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| FRAN DONOVAN et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | 2:08-cv-01675-RCJ-RJJ |
| vs. ) | |
| ) | |
| FLAMINGO PALMS VILLAS, LLC et al., ) | **ORDER** |
| ) | |
| Defendants. ) | |
| ) | |

This case arises out of an alleged conspiracy to defraud investors in a condominium development in Las Vegas. Pending before the Court are: (1) three Financial Institution Defendants' motion to amend their answer(s) to add crossclaims against Appraiser Defendants (ECF No. 712); (2) Sarasota Coast Investors, LLC's ("Sarasota") motion to clarify or reconsider a previous order (ECF No. 746); (3) eighteen Plaintiffs' motion to voluntarily dismiss, either with or without prejudice, but in either case without an award of costs or fees (ECF No. 782); and (4) a motion for determination of good faith settlement agreement (ECF No. 879). For the reasons given herein, the Court grants the motion to amend in part, grants the motion to voluntarily dismiss, with prejudice and without costs or fees, and denies the motion for a determination of good faith settlement. The Court grants the motion for reconsideration and will consider Sarasota's separate proposed order (ECF No. 890). The grant of the motion to voluntarily dismiss also renders moot a pending countermotion for involuntary dismissal (ECF

No. 805).

## I. FACTS AND PROCEDURAL HISTORY

Plaintiffs are eighty-seven individuals who purchased condominium units in a development called the Palm Villas, Las Vegas Cay Club Condominiums (the "Development") between 2005 and 2007. Defendants are individuals and entities who allegedly defrauded Plaintiffs, or assisted in defrauding Plaintiffs, in connection with the Development. The Development consists of approximately 12-acres of land upon which sit sixteen three-story apartment buildings containing a total of 360 rental units. The three apartment buildings occupy 2.64 acres. The remaining 9.44 acres consist of several hundred parking spaces, swimming pools, and other open land (the "Common Area").

Beginning in 2004, Defendants began promoting and selling the units in the Development. Defendants promoted the Development as a "resort community" that would be developed into a hotel. Initially, and before assuming its current name, the Development was called the Las Vegas Cay Club Resort & Marina. Defendants allegedly represented that the Development already boasted numerous valuable amenities, such as large covered patios, weight rooms, and spas, and that Defendants planned to enhance the Development with many other amenities, such as a game room, a water park, a restaurant, and conference facilities. By paying a non-refundable $5000 payment, Plaintiffs were allowed to enter into a Reservation Agreement, which required a $10,000 non-refundable payment per unit reserved for purchase. Plaintiffs were later provided with a price list for the units, ranging from $199,000 to $499,900. After Plaintiffs invested, Defendants circulated various brochures and letters to Plaintiffs, informing Plaintiffs of the status of the Development. These letters and brochures described or displayed images of the various improvements that were being done to the Development. Defendants also circulated a map of the Development.

Plaintiffs allege that the deeds they received for the purchase of each unit represented that

1  Plaintiffs had an interest not only in their purchased units, but also in the Common Area, which
2  included parking spaces, swimming pools, and many other valuable amenities that Defendants
3  promised to add to the Development.  After the deeds were signed, Plaintiffs allege that
4  Defendants circulated a fifty-seven page declaration stating that Plaintiffs' interests in the
5  Development did not in fact include the Common Area, but were limited to their individually
6  purchased rental units and the area common to their particular buildings.  As a result, Plaintiffs'
7  purchased units did not even include any of the Development's parking spaces.  Plaintiffs
8  contend that the representations made in the fifty-seven page declaration conflicted with the
9  advertising and other promotional representations made by Defendants, the deeds, and the
10 appraisals on the units upon which Plaintiffs relied in deciding to invest in the Development.

11      Plaintiffs filed the Complaint on November 26, 2008. (*See* Compl., ECF No. 1).  The
12 Court has already ruled on dozens of dispositive motions.  The operative version of the
13 Complaint is the Third Amended Complaint ("TAC") (ECF No. 335).  Plaintiffs have
14 categorized Defendants therein into several groups: (1) the Fraudulent Enterprise Defendants
15 ("FEPD"); (2) the Promoter/Broker Defendants; (3) the Appraiser Defendants; (4) the Financial
16 Institution Defendants; and (5) the Title Company Defendants.  The Court has denied several
17 dispositive motions against the TAC.

18 **II.    LEGAL STANDARDS**

19     **A.    Amendment**

20     A party may amend its pleading once as a matter of course within . . . 21 days
       after serving it, or . . . if the pleading is one to which a responsive pleading is
21     required, 21 days after service of a responsive pleading or 21 days after service of
       a motion under Rule 12(b), (e), or (f), whichever is earlier.  Other Amendments. In
22     all other cases, a party may amend its pleading only with the opposing party's
       written consent or the court's leave.  The court should freely give leave when justice
23     so requires.

24 Fed. R. Civ. P. 15(a)(1)–(2).  Countrywide and BOA served their Answer to the TAC more than
25 twenty-one days ago, so they require leave of the Court to amend it. (*See* Answer, Mar. 16, 2011,

ECF No. 563). It does not appear that ASC has ever answered the TAC.

### B. Reconsideration

"A motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment." Fed. R. Civ. P. 59(e). Sarasota filed its motion to clarify or reconsider the Court's October 5, 2011 order on October 26, 2011. The motion is therefore timely under Rule 59(e).

### C. Voluntary Dismissal

When a court dismisses with prejudice pursuant to Rule 41(a)(2), attorneys fees should not be provided, because the defendant cannot be made to defend the case again. *See, e.g.*, *AeroTech, Inc, v, Estes*, 110 F.3d 1523, 1527–28 (10th Cir. 1997). When a court dismisses without prejudice under the rule, it is appropriate to condition the dismissal upon payment of attorney's fees, because the defendant may be made to defend a second time. *See, e.g.*, *Cauley v. Wilson*, 754 F.2d 769, 771 (7th Cir. 1985).

### D. Determination of Good Faith Settlement

Under Nevada law, a court's declaration that a settlement is entered into in good faith has specific legal effects:

> 1. When a release or a covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort for the same injury or the same wrongful death:
>
>> (a) It does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide, but it reduces the claim against the others to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is the greater; and
>>
>> (b) It discharges the tortfeasor to whom it is given from all liability for contribution and for equitable indemnity to any other tortfeasor.
>
> 2. As used in this section, "equitable indemnity" means a right of indemnity that is created by the court rather than expressly provided for in a written agreement.

Nev. Rev. Stat. § 17.245. In 1983, a court of this District anticipated that the Nevada Supreme

Court would adopt the rationale of the California courts in interpreting "good faith" under the statute. *See Velsicol Chem. Corp. v. Davidson*, 811 P.2d 561, 563 (Nev. 1991) (quoting *In re MGM Grand Hotel Fire Litig.*, 570 F. Supp. 913, 927 (D. Nev. 1983) (Bechtle, J.) ("Factors to be considered by the Court in assessing whether a settlement is in good faith is [sic] the amount paid in settlement, the allocation of the settlement proceeds among plaintiffs, the insurance policy limits of settling defendants, the financial condition of settling defendants, and the existence of collusion, fraud or tortious conduct aimed to injure the interests of non-settling defendants.") (alteration in *Davidson*)). The Nevada Supreme Court, however, rejected the limitations of California's five-factor test, ruling instead that "determination of good faith [is] left to the discretion of the trial court based upon all relevant facts available, and . . . in the absence of an abuse of that discretion, the trial court's findings [will] not be disturbed." *Id.*

**III. ANALYSIS**

    **A. Amendment**

Movants request leave to amend their Answer to add crossclaims against Appraiser Defendants for contribution and equitable indemnity based upon the alternative theories that Appraiser Defendants' allegedly negligent appraisals was either the sole active malfeasance or a contributing active malfeasance with respect to Plaintiffs' putative damages, such that movant lenders will be entitled to indemnification or contribution, alternatively, if movants are also found to be passively or actively liable. Contribution is a theory under which an active tortfeasor compels another active tortfeasor to pay the latter's fair share of the damage where a plaintiff has recovered or attempted to recover the entire amount against the first tortfeasor. *See, e.g.*, *Saylor v. Arcotta*, 225 P.3d 1276, 1278 (Nev. 2010) (discussing a contribution claim by an allegedly negligent automobile driver against an allegedly negligent surgeon, both of whom may have caused part of the harm). Equitable indemnity is a theory similar to contribution under which a passive tortfeasor can recover from an active tortfeasor any measure of damages for which the

1  former has been made liable to the plaintiff based on the latter's tortious acts. *See, e.g.*, *Black &*
2  *Decker (U.S.), Inc. v. Essex Grp., Inc.*, 775 P.2d 698, 699 (Nev. 1989) (finding Black & Decker
3  entitled to equitable indemnity from Essex where Black & Decker was strictly liable to the
4  plaintiff due to its position in the stream of commerce but Essex was the actively negligent
5  manufacturer).

6  Appraiser Defendants object that amendment is futile for four reasons. First, they argue
7  that the contribution claim is futile because Appraiser Defendants' settlement with Plaintiffs
8  protects Appraiser Defendants from contribution claims by co-Defendants under Nevada
9  Revised Statutes ("NRS") section 17.225(3). That statute provides that "[a] tortfeasor who
10 enters into a settlement with a claimant is not entitled to recover contribution from another
11 tortfeasor whose liability for the injury or wrongful death is not extinguished by the settlement
12 nor in respect to any amount paid in a settlement which is in excess of what was reasonable."
13 But movants are not "tortfeasor[s] who [have] enter[ed] into a settlement." Only Appraiser
14 Defendants have settled, and their settlement does not prevent further contribution by them to
15 other tortfeasors unless a court makes a good faith determination as to that settlement, *see* Nev.
16 Rev. Stat. § 17.245(1)(b), which the Court has declined to do.

17 Second, Appraiser Defendants argue that neither the contribution nor the equitable
18 indemnification claims have accrued because such claims accrue only when the putative
19 indemnitor has discharged its liability, and movants have not been found liable, much less
20 discharged their obligations pursuant to a judgment. Although Appraiser Defendants are correct
21 that a cause of action for contribution or indemnity does not arise in Nevada until the putative
22 contributee or indemnitee has discharged a legal obligation through settlement or judgment, *see*
23 *Rodriguez v. Primadonna Co., LLC*, 216 P.3d 793, 801 (Nev. 2009), a federal court may
24 entertain such a cause of action "prematurely" so long as (1) any resulting judgment against the
25 contributor/indemnitor is made contingent on the contributee/indemnitee's payment to the

1  plaintiff or (2) the court stays any judgment against the contribtor/indemnitor until the

2  contributee/indemnitee shows that it has paid the plaintiff, *Andrulonis v. United States*, 26 F.3d

3  1224, 1233–34 (2d Cir. 1994) (holding that the "may be liable" language of Rule 14(a) explicitly

4  permits such claims in federal court as a procedural matter even before discharge of liability,

5  despite state law to the contrary).

6  Third, Appraiser Defendants argue that there was no special relationship between

7  Appraiser Defendants and movants or any duty of Appraiser Defendants to movants, one of

8  which is necessary to establish an equitable indemnity claim. *See Black & Decker (U.S.), Inc.*,

9  775 P.2d at 699–700.  But the Nevada Supreme Court has held that an appraiser owes a duty of

10  care to a lender. *See Goodrich & Pennington Mortg. Fund, Inc. v. J.R. Woolard, Inc.*, 101 P.3d

11  792, 795 (Nev. 2004) ("While [an appraiser's] duty may not extend to losses arising from a

12  subsequent downturn in the real estate market, 'losses proven to have been sustained that are

13  within the scope of risk created by the negligently conducted appraisal are the defendants'

14  responsibility.'" (quoting Restatement (Second) of Torts § 552 (1977))).  Movants allege in the

15  proposed crossclaim that "numerous lenders, including [Countrywide and BOA]" used and relied

16  on Appraiser Defendants' appraisals to underwrite the loans at issue. (*See* Am. Answer 37, Sept.

17  21, 2011, ECF No. 712-1).  And movants note in reply that Sealey testified at her deposition that

18  she and Rivera did appraisals at the behest of a company called Landsafe that had ordered the

19  appraisals for Countrywide.  The issues are not before the Court on summary judgment however,

20  so the Court need not examine the evidence.  Movants have sufficiently pled a duty of care.

21  Fourth, Appraiser Defendants argue that movants cannot be indemnified if they were

22  active tortfeasors, but only if they are passive tortfeasors.  But movants plead contribution in the

23  alternative.  A claimant may not simultaneously recover on inconsistent theories, but he may

24  simultaneously pursue inconsistent theories in the alternative, *see Sherrin v. Nw. Nat'l Life Ins.*

25  *Co.*, 2 F.3d 373, 379 (11th Cir. 1993), and such practice is sometimes "prudent," *see Townsend*

*v. Holman Consulting Corp.*, 929 F.2d 1358, 1364 (9th Cir. 1990). The TAC bases movants' liability for negligent misrepresentation in part upon their representation to Plaintiffs of the appraisals performed by Appraiser Defendants. (*See* Third Am. Compl. ¶¶ 476–480). Contribution from Appraiser Defendants is therefore available here, because it is possible that a jury will find that movants negligently induced Plaintiffs into taking out loans to purchase the units by, *inter alia*, showing them the negligent appraisals. In such a case, the jury will have to determine comparative fault. The question as to indemnity is whether a jury could, under the TAC, find movants to have been passively liable for the Appraisal Defendants' putative negligence. This does not appear to be possible. The only claim against movants in the TAC is the tenth cause of action for declaratory judgment and negligent misrepresentation. If movants are not found to have been actively negligent, there is no other basis in the TAC for a judgment against them. Movant lenders are nowhere alleged to be strictly or vicariously liable for the actions of Appraiser Defendants or any other Defendant but only to have been actively negligent. The Court therefore grants the motion to amend as to the contribution crossclaim but denies it as to the equitable indemnity crossclaim. The Appraiser Defendants' duty to the movant lenders could also support a crossclaim for professional negligence if the lenders have lost money on the loans due to negligent appraisals. *See Goodrich & Pennington Mortg. Fund, Inc.*, 101 P.3d at 795.

**B.     Reconsideration**

Defendant Las Vegas Cay Club Homeowners Association (the "HOA") previously filed a crossclaim against Sarasota for quiet title, declaratory judgment, and slander of title. The Court granted a motion to dismiss that crossclaim, because it appeared the HOA had not complied with state statutes requiring permission of its members before proceeding with such claims. The Court noted that the HOA would have further opportunity to obtain such permission, however:

> The HOA may also amend the dismissed portions of the crossclaim within 120 days from the date of this order if it can obtain permission to do so from a majority of

> those HOA members voting, after 30 days notice to all HOA members, and after discounting any vote by Sarasota or any other Defendants. Sarasota may not lobby HOA members against such a vote or otherwise interfere.

(Order, 12:8–13, Oct. 5, 2011, ECF No. 725). Sarasota argues that the Court's intent at the hearing was to require a majority of the HOA (minus the votes of Sarasota and other Defendants) to approve the crossclaims, not only a majority of those voting. Sarasota argues that if the order does properly reflect the Court's intent, it is inconsistent with NRS section 116.31088, which requires a majority of all members, not only a majority of those voting.

The audio recording of the hearing indicates that the order accurately reflects the Court's intent as expressed at the hearing. First, the Court noted, "I'll require you to get a majority vote. I'll exclude the vote of Sarasota or any Defendant." (Hr'g 9:32–9:33 a.m., Sept. 30, 2011). The Court then asked counsel, "Does the statute require a majority of homeowners or just a majority of those voting?" (*Id.* 9:33 a.m.). Counsel noted that it required a majority of the homeowners, and that that was a problem because many of the homeowners were not paying dues anymore and didn't care what happened. (*See id.*). The Court then noted that "Then I'll limit it, in equity—the Court's sitting in equity on this issue—I'll limit it to a majority of those voting . . . ." (*Id.*).

The relevant portion of the statute reads: "Except as otherwise provided in this subsection, the association may commence a civil action only upon a vote or written agreement of the owners of units to which at least a majority of the votes of the members of the association are allocated." Nev. Rev. Stat. § 116.31088(1). As an initial matter, the Court must determine whether the words after "written agreement" modify only "written agreement" or "vote or written agreement." If the words are taken to modify only "written agreement," then the statute is satisfied by a "vote," and the Court's order requiring only a majority of those voting is a plainly correct interpretation, because without some additional restriction specified, a vote only requires a majority of those voting as a default rule. This is the better interpretation. Reading

the words after "written agreement" to modify "vote or written agreement" does violence to the statute under at least two canons of statutory interpretation: (1) it renders the words "or written agreement" superfluous; and (2) it makes the voting requirement at best unclear and at worst unintelligible. It renders the words "or written agreement" superfluous because whatever number of owners is required under the "written agreement" prong, the statute would only require this same number of owners to commence a vote under the "vote" prong, and presumably only a majority of them would have to vote "yes" to commence a suit. It also makes the voting requirement hopelessly unclear. The most literal reading would indicate that votes by persons representing a majority of the ownership interests in all units is necessary for a *quorum*, and that only a majority vote within that quorum is required to initiate suit, because the statute requires "a vote [presumably a majority vote] . . . of the owners of units to which at least a majority of the votes of the members . . . are allocated [the quorum]." *Id.* In fact, the statute does not on its face even require weighing the votes of such representatives by the number of units they represent. It is also possible the drafters intended to require a "yes" vote by a majority of unit owners or a majority of voters who in the aggregate represent a majority of units. Either interpretation is plausible, but the statute *says* neither.

Because the language as written is unclear, the Court will not read into it a requirement that the language does not clearly establish. Rather, the Court will select the most liberal interpretation, because under default principles of agency an HOA that is capable of suing and being sued need not obtain permission to sue on behalf of its members. In summary, the best reading of the statute is that the language after "written agreement" simply does not modify "vote," and the Court's order is therefore not in derogation of the statute. And even if the language after "written agreement" did modify "vote," the Court would have to choose the most liberal interpretation of the unclear statute, and that interpretation would be that a majority vote is required within a quorum consisting of persons representing a majority of the units, and that

those persons' votes need not even be weighted in proportion to the number of units they represent. This latter result would be odd, which further supports the conclusion that the language after "written agreement" does not modify "vote."

The Court will grant the motion to reconsider for other reasons. The Court has reconsidered and now believes that the proposed crossclaims did not require a vote, because it falls under two exceptions. First, the crossclaims, although not clearly compulsory, are sufficiently like counterclaims for the purposes of the exception, i.e., consolidation of related actions, to fall within the counterclaim exception. Second, the crossclaims can be fairly said to concern the interpretation of CC&R.

### C. Voluntary Dismissal

Eighteen Plaintiffs move to dismiss voluntarily. *See* Fed. R. Civ. P. 41(a)(2) ("Except as provided in Rule 41(a)(1), an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper."). These Plaintiffs are: Sharon Carpenter, Frank Jreij, Silvana Jreij, Holly Marz, Scott Marz, Cary Robinson, Howard Robinson, Richard Schaeffer, Justin Staub, Velvet Staub, Richard B. Storrs, Barbara Trombley, Helene Trombley, Michael Trombley, Raymond H. Trombley, Patricia A. Wilcox, Paul A. Wilcox, and William Wootan. They prefer a dismissal without prejudice and without an award of costs or fees, but they will agree to dismiss with prejudice if there is no award of costs or fees. Defendants have filed a countermotion requesting dismissal with prejudice and with an award of fees and costs. The Court will dismiss with prejudice, with each side to bear its own costs and fees.

### D. Good Faith Settlement

Defendants Stump, Torey, Callahan & Dietrich ("Stump") and W. Scott Callahan (collectively, "Movants") ask the court to certify a settlement agreement between Movants an Plaintiffs as having been made in good faith under NRS section 17.245. Movants have agreed to

settle their claims with the thirty-eight or thirty-nine[1] Plaintiffs Mr. Hyman still represents for a total of $30,000, with the parties to bear their own fees and costs.  Each Plaintiff will receive just under $800 under the agreement.  Movants do not address Mr. Hyman's contingency fee, which likely equals at least 30% of this amount, leaving each settling Plaintiff with approximately $500.

Although the Nevada Supreme Court has ruled that the "California factors" are not limiting or dispositive in Nevada, they may be considered under the "all relevant facts available" standard the Court adopted in *Davidson*.  Movants argue under those factors.

First, Movants argue that the total settlement amount of $30,000 is reasonable, and in fact "generous," in and of itself.  The Court finds that approximately $500 per Plaintiff is not reasonable in light of Plaintiffs' allegations.  Plaintiffs allege that in addition to Stump and Callahan creating certain Defendant entities, Callahan was a board member of LVCC-HOA who directly participated in the alleged fraudulent enterprise, i.e., in creating and filing the CC&R that excluded the Common Area. (*See* Third Am. Compl. ¶ 216, Mar. 31, 2010, ECF No. 335).  Movants are two of the seventeen FEPD who Plaintiffs charge with violation of securities laws, the Interstate Land Sales Act, and RICO, as well as fraud, civil conspiracy, and negligent misrepresentation. (*See id.* ¶¶ 95–96, 109).  Plaintiffs allege that they purchased units at prices between $300,000 and $600,000 "induced by fraudulent representation in interstate commerce," when the units were in fact worth only $40,000 to $60,000 because the Common Area was not in fact included in the deeds, and certain promised improvements were never made. (*See id.* ¶¶ 179, 334).  The harm alleged due to the fraud is therefore on the order of $400,000 per unit, and the settlement represents approximately 1/800th of the alleged harm for which Movants could be held jointly and severally liable.

Second, Movants argue that the allocation of the settlement proceeds among Plaintiffs is

---

[1] Movants use both of these numbers in their motion.

1  fair. There is no evidence provided of how the proceeds will be divided, but the Court presumes
2  they are to be distributed equally or in proportion to the Plaintiffs' alleged losses.
3       Third, Movants note that their insurance policy limits were not a factor in the settlement.
4  Perhaps Movants' insurance policy limits were not a factor for Movants or Plaintiffs in reaching
5  the settlement, but the issue is an important factor for the Court with respect to a finding of good
6  faith. If $30,000 represents a small fraction of Movants' policy limits, this factor would weigh
7  against a finding of good faith, particularly in light of the minuscule fraction of the alleged
8  damages that the settlement represents. Movants have the burden of convincing the Court that
9  the settlement is fair, and they have not even revealed the limits of their insurance coverage.
10      Fourth, Movants argue that their financial condition was not a factor in their settlement
11 offer. Again, the issue is an important factor for the Court. If Movants are in a position to pay
12 much more than 1/800th of the alleged damages, the present offer may be seen to be unfair. As
13 with their insurance coverage, Movants do not reveal their financial condition.
14      Fifth, Movants argue that there has been no fraud or collusion between them and
15 Plaintiffs.
16      Although the Court cannot prevent the settlement, it will not at this time declare that this
17 settlement is made in good faith under NRS section 17.245. The settlement provides for a tiny
18 fraction of the damages alleged, and Movants have not alleged their insurance coverage or
19 financial position.
20 ///
21 ///
22 ///
23 ///
24 ///
25 ///

**CONCLUSION**

IT IS HEREBY ORDERED that the Motion to Amend Answer (ECF No. 712) is GRANTED in part and DENIED in part. Movants may amend to add a crossclaim for contribution and/or professional negligence, but not for equitable indemnity.

IT IS FURTHER ORDERED that the Motion for Reconsideration (ECF No. 746) is GRANTED.

IT IS FURTHER ORDERED that the Motion to Dismiss (ECF No. 782) is GRANTED in part. The action is dismissed with prejudice as between all Defendants and Plaintiffs Sharon Carpenter, Frank Jreij, Silvana Jreij, Holly Marz, Scott Marz, Cary Robinson, Howard Robinson, Richard Schaeffer, Justin Staub, Velvet Staub, Richard B. Storrs, Barbara Trombley, Helene Trombley, Michael Trombley, Raymond H. Trombley, Patricia A. Wilcox, Paul A. Wilcox, and William Wootan, with the parties to bear their own costs and fees.

IT IS FURTHER ORDERED that the Countermotion for Involuntary Dismissal (ECF No. 805) is DENIED as moot, and the April 13, 2012 hearing is therefore VACATED in part as to Motion No. 805.

IT IS FURTHER ORDERED that the Motion for Good Faith Determination (ECF No. 879) is DENIED.

IT IS SO ORDERED.

Dated this 15th day of February 2012.

_____
ROBERT C. JONES
United States District Judge